# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | **Case No.** 8:24-cv-1626-KKM-AAS |
| Plaintiff, | |
| v. | **COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |
| **START CONNECTING LLC, d/b/a USA Student Debt Relief, a Florida limited liability company;** | |
| **START CONNECTING SAS, d/b/a USA Student Debt Relief, a Colombia corporation;** | |
| **DOUGLAS R. GOODMAN, individually and as an officer of START CONNECTING LLC;** | JUL 9 2024 AM10:27 FILED - USDC - FLMD - TPA |
| **DORIS E. GALLON-GOODMAN, individually and as an officer of START CONNECTING LLC; and** | |
| **JUAN S. ROJAS, individually and as an officer of START CONNECTING LLC and START CONNECTING SAS,** | |
| Defendants. | |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.    The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the Telemarketing Sales Rule, ("TSR"), 16 C.F.R. Part 310, and Section 521 of the Gramm-Leach-Bliley ("GLB") Act,

15 U.S.C. § 6821. Defendants' violations stem from their unfair and deceptive marketing and sale of student loan debt relief services to consumers. For these violations, the FTC seeks relief, including a temporary, preliminary, and permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101–08, and Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a).

## SUMMARY OF THE CASE

2.      Defendants run a predatory student loan debt relief operation known as "USA Student Debt Relief," through which they systematically deceive financially strapped consumers into paying hundreds of dollars for the false promise of student loan forgiveness. Defendants often target Spanish-speaking consumers in Puerto Rico with their scheme.

3.      Defendants reach consumers through a combination of deceptive online advertising and illegal telemarketing, including frequent calls to consumers on the National Do Not Call Registry. In many cases, Defendants have falsely represented that they are affiliated with the United States Department of Education ("ED") or with consumers' ED-contracted loan servicers. After tricking consumers into granting Defendants access to their StudentAid.gov accounts, Defendants tell consumers that they qualify for federal programs that offer low, fixed monthly loan payments followed by

lump-sum loan forgiveness. But to take advantage of these programs, consumers purportedly first must pay a hefty upfront fee.

4.     Defendants' representations are false or unsubstantiated. First, despite having for years represented to the contrary, Defendants are not in any way affiliated with ED or any of the companies that ED contracts to service federal student loans. They have led people to believe that they are simply to earn their trust. Second, although ED offers several income-driven repayment and loan forgiveness programs, not all consumers qualify, and none of the programs guarantee the low, fixed monthly payment structure that Defendants regularly promise. Defendants often lead consumers to believe that they are collecting and facilitating consumers' monthly loan payments when they actually are simply pocketing the money themselves. Defendants reinforce these false or unsubstantiated representations by posting fake reviews and testimonials to their website and social media profiles, as well as to third-party consumer review platforms.

5.     Since at least 2019, Defendants have employed these unfair or deceptive practices to bilk consumers out of millions of dollars. At the same time, however, those practices have triggered numerous complaints from dissatisfied consumers. In 2023, in fact, Defendants settled state enforcement actions in California and Minnesota related to their unlawful debt relief operation, but these actions have failed to deter Defendants' misconduct

3

elsewhere. Through this action, the FTC seeks to put an end to Defendants'
scheme and secure redress for the thousands of consumers whom Defendants
have harmed.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C.
§§ 1331, 1337(a), and 1345.

7.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1),
(b)(2), (c)(1), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b). Venue is proper in
this Division pursuant to Local Rule 1.04 because Defendants' business is
based in Sarasota County, Florida.

## PLAINTIFF

8.     The FTC is an independent agency of the United States
Government created by the FTC Act, which authorizes the FTC to commence
this district court civil action by its own attorneys. *See* 15 U.S.C. §§ 41–58.
The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which
prohibits unfair or deceptive acts or practices in or affecting commerce. The
FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101–08. Pursuant to
the Telemarketing Act, the FTC promulgated and enforces the TSR, 16
C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or
practices in or affecting commerce. The FTC also enforces Section 521(a) of
the GLB Act, 15 U.S.C. § 6821(a), which prohibits obtaining or attempting to
obtain a person's financial information by making false, fictitious, or

fraudulent statements.

## DEFENDANTS

9.     Defendant Start Connecting LLC, also doing business as USA Student Debt Relief ("USASDR"), is a Florida limited liability company that lists its principal place of business as 1412 Pine Bay Drive, Sarasota, FL 34231, which is a single-family home. USASDR transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, USASDR has advertised, marketed, or sold student loan debt relief to consumers throughout the United States.

10.     Defendant Start Connecting SAS, also doing business as Start Connecting, is a Colombia corporation with its principal place of business at Calle 16 6 Rte 21, Offices 301 & 401, Cali, Colombia. Start Connecting SAS transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Start Connecting SAS has advertised, marketed, or sold student loan debt relief services to consumers throughout the United States.

11.     Defendant Douglas R. Goodman is the majority owner and president of USASDR, as well as one of its three authorized members. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of USASDR and Start Connecting SAS,

5

including the acts and practices described in this Complaint. For example, Goodman registered and paid for telephone numbers and domain names associated with USASDR, and he is a signatory on many of the company's bank and merchant processing accounts. He initiated regular wire transfers to USASDR's telemarketing operation in Cali, Colombia, which is operated by his stepson, Defendant Juan Rojas, under the auspices of the Colombia-based Defendant Start Connecting SAS. In addition, Goodman personally responded to complaints filed about his companies with the California Department of Financial Protection and Innovation, the Minnesota Attorney General's Office, and the Better Business Bureau. Defendant Goodman resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

12.    Goodman's wife, Defendant Doris E. Gallon-Goodman, is a manager and authorized member of USASDR. At all times relevant to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of USASDR and Start Connecting SAS, including the acts and practices described in this Complaint. She is a signatory on at least one of USASDR's merchant processing accounts, and payment processor application documents describe her as holding a 20 percent ownership stake in the

6

company, along with her husband, who owns the remaining 80 percent. Defendant Gallon-Goodman resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

13.    Gallon-Goodman's son, Defendant Juan S. Rojas, also known as John Rojas or Juan Sebastian, is the final manager and authorized member of USASDR. He also holds himself out as the chief executive officer of Start Connecting SAS, which Defendant Goodman has described to state law enforcement officials as USASDR's Colombian "sister company." At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of USASDR and Start Connecting SAS, including the acts and practices described in this Complaint. Rojas oversees USASDR's Colombia-based telemarketing operation, which is staffed by employees of Start Connecting SAS and operates using funds collected and disbursed by USASDR. Rojas also registered and paid for domain names associated with USASDR and Start Connecting SAS, served as a customer point of contact for USASDR's merchant processing accounts, and personally responded to Better Business Bureau complaints on USASDR's behalf. Defendant Rojas, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

14.    Defendants USASDR and Start Connecting SAS (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the unfair and deceptive acts and practices and other violations of law alleged below. Corporate Defendants have conducted the business practices described below through interrelated companies that have common ownership, officers, and business functions, and that have commingled funds. Because these Corporate Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

15.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### *Background on Student Loan Repayment and Forgiveness Programs*

16.    Student loan debt is the second largest class of consumer debt, with over 43 million borrowers owing approximately $1.75 trillion. Student loan debt has also historically been one of the most distressed classes of debt. Much of this debt is held by ED.

17.    The federal government has created several student loan forgiveness and discharge programs to help address mounting levels of distressed debt. These programs include income-driven repayment ("IDR")

programs, an umbrella term for a subset of repayment plans that allow eligible borrowers to limit their monthly payments to a percentage of their discretionary income. IDR plans offer lump-sum loan forgiveness to borrowers who make payments for a requisite number of years. Historically, borrowers in IDR plans could have their remaining loan balances forgiven after 20 or 25 years of qualifying payments, although ED recently modified the terms of its newest IDR plan to allow certain borrowers to achieve forgiveness after as few as ten years of repayment. To enroll and remain in an IDR program, borrowers must certify their income and family size annually. Borrowers earning under a certain threshold are eligible for monthly payments as low as $0. A borrower's monthly payments can vary considerably over the course of a repayment term as the borrower's financial and family circumstances change.

18.    In addition to IDR programs, ED makes loan forgiveness or discharge available to discrete subsets of eligible borrowers. For example, the Public Service Loan Forgiveness program forgives the remaining loan balance of borrowers who make income-driven payments for ten years while employed at qualifying government or nonprofit organizations. Teacher Loan Forgiveness forgives up to $17,500 of qualifying loans for borrowers who have been employed as a full-time teacher at an eligible school for five consecutive years. Still other loan programs make loan forgiveness available to borrowers

who can establish a permanent and total disability, borrowers whose schools closed while they were enrolled, and borrowers whose schools violated certain state or federal laws.

19.    Consumers can apply for IDR and forgiveness programs directly through ED or their student loan servicer. There are no application fees, and consumers need not go through third-party companies to enroll.

20.    Separate and apart from these federal loan repayment and forgiveness programs, the federal government implemented sweeping emergency student loan relief in March of 2020 to address the economic hardships wrought by the COVID-19 pandemic. The original coronavirus relief bill, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), temporarily paused payments, accrual of interest, and involuntary collections (such as wage garnishment and reduction of tax refunds) on federally held student loans. This payment pause was extended several times before ultimately expiring in the fall of 2023.

### *Defendants' Student Loan Debt Relief Scheme*

21.    Since February 2019, Defendants have operated an unlawful student loan debt relief enterprise that has scammed consumers out of millions of dollars. Preying on widespread anxiety and confusion around student loan debt, Defendants misrepresent the cost and features of free federal student loan repayment programs to extract fees from the struggling consumers these programs are designed to help.

22.    Defendants operate throughout the United States, but they disproportionately target consumers in Puerto Rico. Of the more than 750,000 outbound calls that Defendants made to consumers between April 2019 and February 2024, approximately 220,000—nearly thirty percent— went to consumers with a Puerto Rico area code, many of whom were monolingual Spanish speakers.

23.    Defendants reach consumers through an aggressive telemarketing campaign run from their call center in Colombia. In addition to making false or unsubstantiated representations during telemarketing calls, Defendants have placed more than 140,000 calls to numbers on the National Do Not Call Registry. Defendants have deceived people into paying for their purported student loan debt relief services by making some combination of the following deceptive claims: (a) Defendants are affiliated with ED or an ED-contracted student loan servicer; (b) consumers who enroll in Defendants' program will be placed in repayment plans with permanently fixed monthly payments—typically of only $9, $19, or $29 for a period of ten or twenty years—at which point the remaining loan balance will be forgiven in full; (c) consumers must pay an advance fee of several hundred dollars before they can be enrolled in the loan forgiveness program; and (d) once the advance fee is paid, consumers' fixed monthly payments will be applied to their loan balances. Defendants make most of these misrepresentations to consumers

11

over the telephone or via email, but their website and social media pages also are laden with similarly false and misleading statements.

### a. Purported Government or Loan Servicer Affiliation

24.    USASDR is not and has never been affiliated with ED or any ED-contracted loan servicer. But Defendants have frequently started their telemarketing sales calls by luring consumers in with a false affiliation claim. Defendants often know that the consumers they are calling have outstanding student loans, and Defendants sometimes also have the consumer's address, email, and full or partial Social Security number. This, in combination with the official-sounding "USA Student Debt Relief" name, leads many consumers to believe that Defendants are affiliated with the federal government or with their federal student loan servicer.

25.    For years, Defendants often reinforced this false impression explicitly during their sales pitch. Consumers report being told that USASDR worked with the government, or that it was affiliated or had a relationship with ED or the consumer's federal student loan servicer. Even a "Sample Sales Script" that Defendants submitted as part of an application for payment processing services instructed agents to say that USA Student Debt Relief "work[s] with Federal Programs . . . where you have the chance to have a reduction on your loan," and that they use a software that "is linked with the Department of Education's repayment calculator."

26.    If consumers express skepticism during Defendants' telemarketing calls, Defendants often encourage them to visit their www.usastudentdebtrelief.com website to confirm that USASDR is legitimate. Much of the content Defendants have posted on that website and on their Facebook and Instagram pages reinforces the false affiliation claim. Some posts have featured photographs of or ad copy about President Biden and his administration's initiatives related to federal student loan debt. On July 21, 2022, for example, Defendants published a Facebook post displaying USASDR's logo next to a photograph of President Biden. The post was captioned "Student Loans: 3 Important Deadlines," and the accompanying text purported to list three impending Biden administration student debt-related initiatives. The post required viewers to click on a link to USASDR's website to learn the dates of these three purported deadlines.

**Figure 1. July 21, 2022 Facebook post.**



27.    Other online content posted by Defendants explicitly invokes the

Department of Education and its affiliates. For example, a July 25, 2021

graphic that Defendants cross-posted to Instagram and Facebook proclaimed:

"You can trust us as we work with organizations backed by the U.S.

Department of Education."

**Figure 2. July 25, 2021 Instagram post.**



28.     Having engendered a sense of trust based on this purported

official affiliation, Defendants then manipulate consumers into granting

access to their Federal Student Aid (FSA) accounts during the telemarketing

calls. In some cases, Defendants simply ask consumers for their FSA

credentials, which consumers provide on the assumption that Defendants are

affiliated with the government or their loan servicer. In other cases,

Defendants access consumers' FSA accounts without consumers even

realizing they are doing so, typically by tricking the consumer into

14

unknowingly authorizing a password reset request. Once in the accounts, without consumers' knowledge or authorization and in violation of FSA's terms and conditions, Defendants often proceed to change consumers' account information, such as their usernames, passwords, security questions, and contact information. As a result, some consumers stop receiving correspondence from ED and from their loan servicers.

29.    Having accessed the consumer's StudentAid.gov account, Defendants then are able to review the consumer's specific loan information with them over the telephone. For consumers who do not yet realize that Defendants have accessed their accounts, this reinforces Defendants' affiliation claim because consumers assume that only the government or a federal student loan servicer could have access to such sensitive personal information.

### b. False Promise of Low Fixed Monthly Payment

30.    After hooking consumers and getting access to their account, Defendants then represent that consumers qualify for a "loan forgiveness program," often referencing one of ED's official IDR repayment programs by name. The "forgiveness program" that Defendants describe bears no actual resemblance, however, to any legitimate IDR plan.

31.    Regardless of a consumer's job, income, family size, and other circumstances, Defendants promise consumers that they can lock in a reduced, fixed monthly payment for the life of the repayment period followed

by lump-sum forgiveness. In many cases, Defendants specifically tell consumers that after paying an upfront fee, their monthly loan payments will be permanently fixed at only $9, $19, or $29 for a repayment period lasting up to 240 months, at which point the remaining balance on their loans purportedly would be forgiven in full.

32.    The monthly payment amounts quoted by Defendants are completely fabricated and have nothing to do with the legitimate loan repayment programs made available by ED. Defendants sometimes quote consumers these fixed monthly payment amounts before even knowing consumers' specific circumstances. Defendants sometimes also quote consumers the specific dollar amount that purportedly would be forgiven at the end of the repayment term, but that is often simply another invented figure that leads people to believe that a significant portion of their overall debt will be forgiven.

33.    In reality, borrowers in ED IDR plans are never guaranteed a long-term fixed monthly payment because borrowers must recertify their income and family size annually, which means their monthly payments will almost certainly change from year to year. Similarly, not all borrowers in IDR plans end up obtaining loan forgiveness at the end of the repayment term. A borrower whose income increases over the years might ultimately pay off the debt before the repayment term ends. Defendants explain none of these

16

nuances during their marketing pitch and instead entice consumers to sign up for their service with impossible guarantees of a long-term, fixed monthly payment followed by lump-sum forgiveness.

### c. Payment of Advance Fee as Prerequisite to Enrollment

34.     Borrowers are able to access all of ED's loan consolidation, repayment, and forgiveness programs for free—neither ED nor the loan servicers it contracts with require any application fee. In Defendants' telephone sales pitch to consumers, however, they falsely represent that obtaining access to these programs requires payment of a hefty upfront fee.

35.     Specifically, Defendants tell consumers during their telemarketing sales pitch that qualifying for the IDR plan they have described requires paying a fee that typically ranges from $400 to $1200 and is collected in several installments. Some consumers are led to believe that this fee is being applied to their loan balance. Others understand that it is not a loan payment, but are led to believe that an "enrollment," "consolidation," or "processing" fee must be paid before they can access an IDR plan. Consumers do not realize that the payment is in fact a fee charged only by USASDR to enroll consumers in a free program.

36.     Defendants start collecting this fee upfront, before they have taken any action to restructure consumers' student loans or enroll consumers in a repayment plan. In fact, Defendants' form contract explicitly states that

17

USASDR will not start "processing [the] Client's account" until after it has collected an initial payment.

37.     In addition to violating the TSR's prohibition on charging advance fees for debt relief services, this practice contradicts the explicit assurance advertised on Defendants' website that consumers will pay "No fees until you settle your account."

**Figure 3. No fees until you settle your account.**



38.     In most instances, Defendants attempt to collect consumers' credit or debit card information during the initial telemarketing call so they can begin collecting the advance fee from consumers immediately. If Defendants do end up taking some kind of action on a consumer's behalf (such as applying for a consolidation loan and/or enrolling the consumer in an IDR plan), they often do so only after the advance fee has been collected in full.

### d. False Claim that Low Fixed Monthly Payments Are Applied to Loans

39.    After consumers finish paying the advance fee, their monthly payments typically drop to the fixed monthly $9, $19, or $29 amounts touted by Defendants as part of their initial sales pitch. Defendants frequently represent that this fixed amount will be consumers' new monthly loan payment, thereby conveying that the payments will be applied to consumers' outstanding loan balances. In reality, however, Defendants simply pocket these monthly payments along with the advance fees and put nothing toward consumers' loans.

40.    Defendants took advantage of the loan payment pause implemented in response to the COVID-19 pandemic to better conceal the fact that consumers' fixed monthly payments were not being applied to their loans. During that time, consumers were not receiving bills from their loan servicers and often were not consistently monitoring their loan balances. Many consumers paid Defendants hundreds or thousands of dollars over the course of years, mistakenly thinking their payments were being applied to their loans.

41.    Consumers who eventually realize that their payments are not being applied to their loans sometimes call Defendants to complain or seek clarification. When confronted, Defendants often walk back their previous assertions about the low fixed monthly payments going toward consumers'

loans. Instead, they make new misrepresentations in an effort to talk consumers out of cancelling. For example, Defendants sometimes attempt to recharacterize the monthly payment as a "monitoring fee" that Defendants collect in exchange for securing consumers' participation in special loan forgiveness programs that do not require consumers to pay anything toward their loans each month. Such representations are equally misleading. During the pandemic, *all* consumers were exempt from federal student loan payments; Defendants played no role in securing that relief for their customers. Now that loan repayment has resumed, moreover, many low-income borrowers qualify for $0 monthly payments under IDR plans. But consumers can enroll in those plans for free, without paying Defendants any sort of monthly fee.

42.    When consumers began receiving bills from their loan servicers following the end of the COVID-19 repayment pause, Defendants began making even more damaging misrepresentations in their efforts to make and save sales. For instance, when dealing with skeptical consumers, Defendants' telemarketers sometimes have claimed that loan servicers give "false information" about Defendants' forgiveness programs by telling consumers that they are "fraudulent." In some instances, Defendants have gone so far as to instruct consumers to ignore bills and other correspondence from their loan servicers. Some consumers have failed to make payments as a result, putting

them at risk of default.

### *Defendants' Contracts*

43.    Once Defendants have convinced consumers to enroll in the
program and turn over their payment information over the phone,
Defendants typically email consumers a link to a ten-page, densely worded
form contract that consumers are required to sign electronically and under
circumstances that make careful review impossible. Consumers often access
the contract using their cellphones, and Defendants pressure them to click
through the document and sign multiple pages, including a power of attorney
form, while still on the telemarketing call. By this point, consumers have
often been on the phone with Defendants for a long time, and many
consumers feel pressured to sign the contract quickly. Although Defendants
often target consumers in Puerto Rico, including substantial numbers of
monolingual Spanish speakers, Defendants only ever provide consumers with
an English-language version of the contract.

44.    Not surprisingly, the terms in Defendants' form contract bear
very little relationship to the service consumers thought they had purchased.
In opaquely worded fine print, the contract purports to obligate Defendants
only to prepare and submit loan consolidation and repayment plan
applications on the consumer's behalf, and then to "monitor" the file during
the repayment term, with the monthly loan payments being described as a
"monthly monitoring" fee.

21

45.     Defendants' contract says nothing about reducing the consumer's monthly loan payments or about obtaining any "loan forgiveness." Indeed, buried on the contract's eighth page is a hidden disclaimer contradicting the key selling points Defendants make during the telemarketing pitch and admitting that Defendants will not pay consumers' loans with the money they collect.

### *Defendants' Fake Reviews and Testimonials*

46.     Defendants' unfair and deceptive conduct has generated many complaints to the FTC, the Better Business Bureau, and state attorneys general. As the chorus of negative consumer feedback has grown, Defendants have invested substantial energy in attempting to maintain a veneer of legitimacy by posting fake reviews and testimonials online.

47.     For example, an August 19, 2022 post on Defendants' Instagram and Facebook featured a testimonial by "Ana Rojas." The post claimed that USASDR had reduced her loan payments from $1300 per month for 28 years to only $417 per month for eight years.

**Figure 4. Fake Consumer Testimonial posted August 19, 2022.**



48.    Another Instagram and Facebook post by Defendants on September 7, 2022 featured a similar testimonial by "Jorge Florez." The post claimed that USASDR helped him enroll in an IDR plan that lowered his monthly payment to $1,100 for the next 15 years.

**Figure 5. Fake Consumer Testimonial posted September 7, 2022.**



49.    Both of these testimonials are fake. They describe repayment
scenarios that are not attainable under any federal student loan repayment
plan—no plan allows consumers to lock in a fixed, income-based monthly
payment over the entire repayment term. In addition, both testimonials
feature stock photos available for download online rather than photos of
actual customers. Indeed, Defendants feature stock photos and videos in
many of their social media posts in a manner that falsely suggests that they
depict actual USASDR customers.

50.    Defendants and their associates have also posted fake positive
reviews on USASDR's website as well as on third-party consumer review
platforms like the Better Business Bureau, Facebook, and Trustpilot. Some of
these reviews have been posted under the names of family members or

24

associates of the individual defendants, including Defendant Goodman's son and Defendant Gallon-Goodman's daughter.

### *Defendants' Unlawful Calls to Consumers on the National Do Not Call Registry*

51.    Since April 2019, Defendants have initiated or caused to be initiated over 750,000 outbound telephone calls to consumers.

52.    Defendants have made over 140,000 calls to telephone numbers on the National Do Not Call Registry.

53.    Defendants have also called telephone numbers in various area codes without first paying the annual fee for access to the telephone numbers within such area codes that are included in the National Do Not Call Registry.

54.    To date, consumers on the National Do Not Call Registry have filed at least three separate lawsuits alleging that one or more of the Defendants called them in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227.

### *Scale and Impact of Defendants' Operation*

55.    Since 2019, Defendants have received more than seven million dollars in upfront fees and monthly payments from consumers with student loan debt. Using the unlawful practices described above, Defendants have accessed tens of thousands of Federal Student Aid accounts, according to information provided by ED. Defendants also have disproportionately

targeted consumers in Puerto Rico, who receive approximately 30 percent of
Defendants' telemarketing calls.

56.    To the extent that Defendants take any action on consumers'
student loans at all, those actions are sometimes actively harmful. For
example, Defendants typically consolidate consumers' loans as a matter of
course, even though consolidation is not always beneficial. Defendants have
also affirmatively misrepresented consumers' incomes and family sizes when
submitting certified documents to ED and loan servicers in order to
fraudulently obtain IDR plans with low or no monthly payments, all without
consumers' knowledge or consent.

### *Ongoing Conduct*

57.    Defendants have persisted with their unlawful scheme even in
the face of recent state enforcement actions. In November 2023, USASDR and
Defendant Goodman settled claims brought by the California Department of
Financial Protection and Innovation, which alleged that they had
misrepresented their services, collected unlawful advance fees in violation of
the TSR, and failed to secure appropriate licensure in violation of California
law. In December 2023, USASDR and Defendant Goodman settled a similar
set of claims by the Minnesota Attorney General's Office for violations of
Minnesota law.

58.    In spite of these state actions and notice of its violations of the
TSR, Defendants have continued their misconduct in other states and Puerto

Rico. In lieu of actually changing the unlawful ways that they market their debt relief services, Defendants have instead now added at the bottom of their website's lengthy landing page a hidden, fine-print disclaimer purporting to clarify that USASDR is not affiliated with ED or any other government entity and that it "does not provide debt relief services" (despite having the words "Debt Relief" in its name). The presence of this patently ineffective disclaimer shows that Defendants have no intention of correcting their illegal practices and are instead doubling down on their scheme.

**Figure 6. Hidden fine-print disclaimer.**



59.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

60.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or

deceptive acts or practices in or affecting commerce."

61.   Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

62.   Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## Count I
## Deceptive Student Loan Relief Representations

63.   In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of student loan debt relief services, Defendants represent, directly or indirectly, expressly or by implication, that:

   a. Defendants are affiliated or work directly with the Department of Education or federal student loan servicers;

   b. Defendants will enroll consumers in a student loan repayment or forgiveness program that will reduce their monthly payments to a guaranteed low, fixed amount for a set number of years, at which point the remaining loan balance will be forgiven in full;

   c. Consumers must pay an advance fee to enroll in federal loan

repayment or forgiveness programs; and

    d. Consumers' monthly payments to Defendants will be applied

       toward consumers' student loans.

64.    Defendants' representations as described in Paragraph 63 are false or misleading or were not substantiated at the time the representations were made.

65.    Therefore, Defendants' representations as described in Paragraph 63 are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II**
**False or Misleading Endorsements**

66.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of student loan debt relief services, Defendants represent, directly or indirectly, expressly or by implication, that certain reviews of and testimonials about USA Student Debt Relief are truthful accounts by actual customers.

67.    In fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 66, the reviews of and testimonials about Defendants' business are not truthful accounts by Defendants' actual customers, but instead are fabricated by Defendants or by others on Defendants' behalf.

68.    Therefore, Defendants' representations as described in

29

Paragraph 66 are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count III
### Unfairly Providing Consumers Contracts in a Language in Which Consumers Are Not Fluent

69.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of student loan debt relief services, Defendants provide consumers with a contract that is in English, even when Defendants' sales pitch and email communications are in Spanish and many of Defendants' customers do not speak or read English fluently, if at all, and therefore cannot read and understand the contract.

70.    Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

71.    Therefore, Defendants' acts or practices as described in Paragraph 69 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

### VIOLATIONS OF THE TELEMARKETING SALES RULE

72.    In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101–6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain sections

thereafter.

73.     Defendants are "seller[s]" or "telemarketer[s]" engaging in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg). A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration. 16 C.F.R. § 310.2(dd). A "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff). "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. 16 C.F.R. § 310.2(gg).

74.     Defendants are sellers or telemarketers of "debt relief services" as defined by the TSR, 16 C.F.R. § 310.2(o). Under the TSR, a "debt relief service" means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector. 16 C.F.R. § 310.2(o).

75.     The TSR prohibits sellers and telemarketers from requesting or

31

receiving payment of any fees or consideration for any debt relief service until
and unless:

      a.  The seller or telemarketer has renegotiated, settled, reduced,
or otherwise altered the terms of at least one debt pursuant to
a settlement agreement, debt management plan, or other such
valid contractual agreement executed by the customer; and

      b.  The customer has made at least one payment pursuant to that
settlement agreement, debt management plan, or other valid
contractual agreement between the customer and the creditor;
and

      c.  To the extent that debts enrolled in a service are renegotiated,
settled, reduced, or otherwise altered individually, the fee or
consideration either:

          i.  Bears the same proportional relationship to the total fee
for renegotiating, settling, reducing, or altering the terms
of the entire debt balance as the individual debt amount
bears to the entire debt amount. The individual debt
amount and the entire debt amount are those owed at the
time the debt was enrolled in the service; or

        ii.  Is a percentage of the amount saved as a result of the
renegotiation, settlement, reduction, or alteration. The

percentage charged cannot change from one individual

debt to another. The amount saved is the difference

between the amount owed at the time the debt was

enrolled in the service and the amount actually paid to

satisfy the debt. 16 C.F.R. § 310.4(a)(5)(i).

76.    The TSR prohibits sellers and telemarketers from
misrepresenting, directly or by implication, a seller's or telemarketer's
affiliation with, or endorsement or sponsorship by, any person or government
entity. 16 C.F.R. § 310.3(a)(2)(vii).

77.    The TSR prohibits sellers and telemarketers from
misrepresenting, directly or by implication, any material aspect of any debt
relief service, including, but not limited to, the amount of money or the
percentage of the debt amount that a customer may save by using the service.
16 C.F.R. § 310.3(a)(2)(x).

78.    The TSR also establishes the National Do Not Call Registry,
maintained by the FTC, of consumers who do not wish to receive certain
types of telemarketing calls. Consumers can register their telephone numbers
on the Registry without charge either through a toll-free telephone call or
online at donotcall.gov.

79.    The TSR prohibits sellers and telemarketers from initiating or
causing others to initiate outbound telephone calls to consumers who have

registered their telephone numbers on the National Do Not Call Registry. 16 C.F.R. § 310.4(b)(1)(iii)(B).

80.    The FTC allows sellers, telemarketers, and other permitted organizations to access the National Do Not Call registry over the Internet at telemarketing.donotcall.gov, to pay the fee(s) if required by the TSR, and to download a list of numbers not to call.

81.    The TSR prohibits sellers and telemarketers from calling any telephone number within a given area code unless the seller on whose behalf the call is made has paid the annual fee for access to the telephone numbers within that area code that are included in the National Do Not Call Registry. 16 C.F.R. § 310.8.

82.    Consumers who receive telemarketing calls to their registered numbers can complain of National Do Not Call Registry violations through a toll-free telephone call or online at donotcall.gov, or by otherwise contacting law enforcement authorities.

83.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count IV
## Advance Fee for Debt Relief Services

84. In numerous instances, Defendants have, in connection with the telemarketing of student loan debt relief services, requested or received payment of a fee or consideration for debt relief services before:

      a.  Defendants have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

      b.  The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor.

85. Therefore, Defendants' acts or practices as described in Paragraph 84 violate Section 310.4(a)(5)(i) of the TSR, 16 C.F.R. § 310.4(a)(5)(i), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count V
## Misrepresentation of Affiliation

86. In numerous instances, Defendants have, in connection with the telemarketing of student loan debt relief services, misrepresented, directly or indirectly, expressly or by implication, that Defendants are affiliated with, or endorsed or sponsored by, the Department of Education or federal student loan servicers.

87. Therefore, Defendants' acts or practices as described in

Paragraph 86 violate Section 310.3(a)(2)(vii) of the TSR, 16 C.F.R.

§ 310.3(a)(2)(vii), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count VI
## Material Debt Relief Misrepresentation

88.    In numerous instances, Defendants have, in connection with the

telemarketing of student loan debt relief services, misrepresented, directly or

indirectly, expressly or by implication, material aspects of their debt relief

services, including that:

  a. Defendants will enroll consumers in a student loan repayment
     or forgiveness program that will reduce their monthly
     payments to a guaranteed low, fixed amount for a set number
     of years, at which point the remaining loan balance will be
     forgiven in full;

  b. Consumers must pay an advance fee to enroll in federal loan
     repayment or forgiveness programs; and

  c. Consumers' monthly payments to Defendants will be applied
     toward consumers' student loans.

89.    Therefore, Defendants' acts or practices as described in

Paragraph 88 violate Section 310.3(a)(2)(x) of the TSR, 16 C.F.R.

§ 310.3(a)(2)(x), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count VII
## Calls in Violation of National Do Not Call Registry

90.    In numerous instances, Defendants have, in connection with the telemarketing of student loan debt relief services, initiated or caused others to initiate outbound telephone calls to consumers who have registered their telephone numbers on the National Do Not Call Registry.

91.    Therefore, Defendants' acts or practices as described in Paragraph 90 violate Section 310.4(b)(1)(iii)(B) of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count VIII
## Failure to Pay Required Fee for Access to National Do Not Call Registry

92.    In numerous instances, Defendants have, in connection with the telemarketing of student loan debt relief services, initiated, or caused others to initiate, outbound telephone calls to telephone numbers within a given area code when Defendants had not, either directly or through another person, paid the required annual fee for access to the telephone numbers within that area code that are included in the National Do Not Call Registry.

93.    Therefore, Defendants' acts or practices as described in Paragraph 92 violate Section 310.8 of the TSR, 16 C.F.R. § 310.8, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE GRAMM-LEACH-BLILEY ACT

94.    Section 521 of the GLB Act, 15 U.S.C. § 6821, became effective on

November 12, 1999, and remains in full force and effect. Section 521(a)(2) of the GLB Act, 15 U.S.C. § 6821(a)(2), prohibits any person from "obtain[ing] or attempt[ing] to obtain . . . customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution."

95.    The GLB Act defines "customer" to mean "with respect to a financial institution, any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary." 15 U.S.C. § 6827(1). The GLB Act defines "customer information of a financial institution" as "any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of the financial institution and is identified with the customer." 15 U.S.C. § 6827(2). The GLB Act defines "financial institution" to include "any institution engaged in the business of providing financial services to customers who maintain a credit, deposit, trust, or other financial account or relationship with the institution." 15 U.S.C. § 6827(4)(A).

96.    Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a), empowers the FTC to enforce Section 521 of the GLB Act "in the same manner and with the same power and authority as the [FTC] has under the Fair Debt Collection Practices Act [FDCPA] . . . to enforce compliance with such Act."

97.    Section 814(a) of the FDCPA, in turn, makes violating the FDCPA an unfair or deceptive act or practice in violation of the FTC Act. 15 U.S.C. § 1692*l*(a). Section 814(a) of the FDCPA further provides that all of the functions and powers of the FTC under the FTC Act are available to the FTC to enforce compliance by any person with the FDCPA, including the power to enforce provisions of the FDCPA in the same manner as if the violation had been a violation of an FTC trade regulation rule. Thus, pursuant to Section 522(a) of the GLB Act, the FTC may enforce Section 521 of the GLB Act in the same manner as if a violation of the GLB Act were a violation of an FTC trade regulation rule.

98.    Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of FTC trade regulation rules. Accordingly, Section 19 of the FTC Act, 15 U.S.C. § 57b, also authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of the GLB Act. This relief may include, and is not limited to, recission or reformation of contracts, and the refund of money or return of property.

## Count IX
### Use of False Statements to Obtain Customer Information

99.    In various instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of student loan debt relief

services, Defendants make false, fictitious, or fraudulent statements or representations to customers of financial institutions to obtain or attempt to obtain customer information of a financial institution, such as credit or debit card numbers.

100.    Defendants obtain or attempt to obtain the customer information of a financial institution by representing to customers of financial institutions, directly or indirectly, expressly or by implication, that:

a.    Defendants are affiliated or work directly with the Department of Education or federal student loan servicers;

b.    Defendants will enroll consumers in a student loan repayment or forgiveness program that will reduce their monthly payments to a guaranteed low, fixed amount for a set number of years, at which point the remaining loan balance will be forgiven in full;

c.    Consumers must pay an advance fee to enroll in federal loan repayment or forgiveness programs; or

d.    Consumers' monthly payments to Defendants will be applied toward consumers' student loans.

101.    Defendants' representations set forth in Paragraph 100 above are false, fictitious, or fraudulent within the meaning of Section 521 of the GLB Act.

102.    Therefore, Defendants' acts or practices as described in Paragraphs 99 to 101 above violate Section 521(a) of the GLB Act, 15 U.S.C. § 6821, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

103.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and the GLB Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, and the GLB Act;

B.    Grant preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief;

C.    Award monetary and other relief within the Court's power to grant, including the recission or reformation of contracts, the refund of money, or other relief necessary to redress injury to consumers; and

D.    Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated: July 9, 2024

Nathan Nash (Lead Counsel)
D'Laney Gielow
Karen D. Dodge
Federal Trade Commission, Midwest Region
230 S. Dearborn, Suite 3030
Chicago, Illinois 60604
Phone: (312) 960-5624
E-mail: nnash@ftc.gov
           dgielow@ftc.gov
           kdodge@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION